### ADKINS–POLK CO. v. PATE. (No. 3602.)

Court of Civil Appeals of Texas. Texarkana. Nov. 15, 1928.

Allan V. McDonnell, of Waco, for appellant.

J. A. Dial, of Sulphur Springs, and Mayo W. Neyland, of Greenville, for appellee.

HODGES, J. This suit was filed in the court below to recover of the appellant the sum of $900 claimed as the balance due on a rental contract. The plaintiff below pleaded and proved that he was the owner of a warehouse in the city of Sulphur Springs, Tex. He alleged that during the year 1922 he entered into a contract with the appellant, in which the latter leased from him the warehouse for a term beginning September 1, 1922, to August 31, 1923, at an agreed rental of $1,200 per year, payable in advance in monthly installments of $100; that it was further agreed that if the appellant desired to occupy the building for the year beginning September 1, 1923, and ending August 31, 1924, it might do so upon the same terms. He also alleged that the defendant entered into possession of the building under that contract and occupied the same, paying the agreed rental till November, 1926, at which time appellant abandoned the building and refused to pay any other installments of rent. Appellee prayed for a judgment in the sum of $900 as rents due for the succeeding months of December, January, February, March, April, May, June, July, and August. A jury was waived, and the issues of fact were submitted to and decided by the court. After permitting the appellee to file a trial amendment so as to make the pleadings conform to the evidence adduced by the appellee, the court rendered a judgment in his favor for the amount sued for. The objection here urged to the judgment is that it was not warranted by the evidence.

The facts show that the rental contract relied on was a parol agreement made between E. B. Pate, a son of the appellee O. M. Pate, and A. C. Adkins, who was at that time the vice president of the Adkins-Polk Company. The latter company was then a private corporation engaged in the wholesale grocery business at Dallas, Tex. E. B. Pate testified as follows: "The first time I recall and the circumstances and conditions and purposes of my meeting with Mr. Adkins was to rent him this building. I didn't go to see Mr. Adkins; he came down to my place of business at the house and looked over the house and asked me if I would rent that building, or I told him I wanted to rent the building, and he asked me what I would take for the rent on the building. I knew what he wanted to rent it for because Mr. Henderson had told me that. At that time Mr. Henderson was representing Adkins-Polk Company in Sulphur Springs, and I knew that. As to the conversation I had with Mr. Adkins about renting him the building, I told him that my father always rented his buildings from September to September, that is the way he rented the buildings—now this was before September—but that I would rent him the building from September to September for $1,200.00 a year, payable $100.00 a month—that was $100.00 a month—but he was to pay me the rent up to September at

the same rate, $100.00 a month; but that we rented all our buildings from September to September. He said that he believed he would take the building, and that if he decided to take it Mr. Henderson would let me know the next morning; and the next morning Mr. Henderson told me Mr. Adkins said he would take the building. When I was talking to Mr. Adkins he also asked me how long he could keep the building too, and I told him that he could keep that under these terms just as long as he wanted to; and he wanted to know if I wanted a written contract, and I told him no, his word was good enough for me—that a verbal contract was good enough. No, he and I did not discuss renting the building for a less period than from September the 1st to September 1st. * * * I never at any time rented that building to Louis Henderson. After Mr. Adkins was down there the following morning Louis Henderson told me the Adkins-Polk Company would take the building. On the day before that I went into details with Mr. Adkins about the way my father rented his buildings and for the length of time. I told him he rented the buildings from September to September, and I told him Louis also had a little sugar in there, and that he was to pay $100.00 a month up to September and I wouldn't charge him any rent for the part of a month he had been in there, but that the rent would start from September to September. After I told him, Mr. Adkins, this he told me Louis would notify me the next day."

On cross-examination this witness stated: "As to whether there was anything said as to who Mr. Adkins was speaking for, whether he was speaking for his brother-in-law (Louis Henderson) or speaking for his company, or speaking for himself, I understood he was speaking for the Adkins-Polk Company; I would not say now whether anything was said along that line or not; I would not say one way or the other on that, because I want to be fair and right, and I would not say about that. As to whether it is my opinion that he was representing the Adkins-Polk Company, I might have gotten that from hearsay through Mr. Henderson; you get lots of impressions that way, you could not say. I figured if I was trading with Mr. Adkins personally or with Adkins-Polk Company, either one, they would be personally liable, and that is the way I felt about that; and if Mr. Adkins would tell me anything personally, just like I told him, I says, 'Your word is good enough for me. I don't want any written contract.' That is the way I felt about that."

On a redirect examination the witness said:

"He said he was renting this place to go in business. He said, 'I will have Louie to let you know whether I want this building in the morning or not.' I rented it to Ad-kins-Polk Company. I rented to Mr. Adkins to put this business in there. I could not tell you whether he told me anything to that effect.

"Question. You just did not know whether you rented it to Mr. Adkins or Adkins-Polk, is that it? Answer. I rented to Mr. Adkins is who I made the deal with.

"Question. Individually to him or the Adkins-Polk Company? Answer. No, the Adkins-Polk Company. I didn't receive any checks from Mr. Adkins himself; he didn't tell me he wanted it for himself, he wanted it to put a business in there, he told me that; he didn't tell me at the time whose business it was going to be. I knew at the time that the Adkins-Polk Company was a corporation in business in Dallas, I don't think they were in Greenville at that time, and they were going to put a house in at Sulphur Springs; that was the purpose of my renting the building to them for my father."

On recross-examination the witness said: "As to my statement that I rented to Mr. Adkins for the Adkins-Polk Company being an impression, well, that is really the truth of the business; yes, that is what I thought I was doing. So far as what was said, I have no recollection, only what Mr. Henderson told me, of anything being said about the corporation wanting to put in a branch house at Sulphur Springs; it was nothing Mr. Adkins said, because I talked to Mr. Henderson more than I did to Mr. Adkins."

A. C. Adkins testified, in substance, that he contracted for the rent of the building for his brother-in-law, Henderson, to whom he was at the time rendering some financial assistance. He denied that he represented the Adkins-Polk Company in the transaction with E. B. Pate. He also denied that there was any agreement between him and Pate about renting the building from year to year. He further stated that the building was not occupied by the Adkins-Polk Company till July, 1925. The undisputed testimony shows that soon after the rental contract was made the building was occupied by Henderson, who conducted a grocery business in his own name. Henderson also paid the first rental installments by checks drawn by him in his own name. Some time later the business was incorporated and conducted in the same building under the name of the American Mercantile Company. Still later the business was purchased by the Hopkins-McLain Company, a private corporation, which occupied the building, conducting the business in its own name, till July, 1925. On that date the business was purchased and conducted thereafter by the Adkins-Polk Company till November of 1926. During the time the building was occupied by Henderson, the American Mercantile Company, and the Hopkins-McLain Company, the rental installments were paid by checks drawn by those parties in their own names during their

respective periods of occupancy. It was not until July, 1926, that any of the rental installments were paid in checks drawn by the Adkins-Polk Company in its name. It is conceded by all parties that no other rental contract was made except the parol agreement heretofore referred to between E. B. Pate and A. C. Adkins, in the spring of 1922. It appears from the appellee's trial amendment filed after the conclusion of the testimony, and from the argument made in his brief, that he seeks to hold the appellant liable as a tenant holding over under a contract providing for a rental from year to year.

In his petition upon which the appellee went to trial, he alleged that the rental contract was made with the appellant corporation, *without stating the name of the agent or representative through whom the corporation acted.* The defense was a general denial, which imposed upon the plaintiff in the case the burden of proving the making of a contract which bound the appellant. Corporations can act only through agents, and it is elementary that one who seeks to hold a corporation liable upon a contract made by an agent has the burden of proving, not only the execution of the contract for the corporation, but the authority of the agent through whom it is claimed the corporation acted. The proof in this case shows that the contract here relied on was made by E. B. Pate, representing O. M. Pate, the appellee, and by A. C. Adkins, who was at the time a vice president of the appellant corporation. There is no evidence that Adkins pretended on that occasion to represent his company. He testified that he was contracting for the personal benefit of his brother-in-law, Louis Henderson. The evidence further shows that Henderson took possession of the building as the first tenant under that contract, and paid the monthly rent with his own checks. The possession of the building later passed from Henderson to a corporation, the American Mercantile Company, which took over his business; and still later to another corporation, known as the Hopkins-McLain Company. Each of these corporations paid their rentals monthly by their checks. There is no evidence that the appellant was in any way interested in the business conducted in the building by these different tenants, nor is there any evidence that there was any assignment of the original lease contract by one tenant to another. The respective occupants of the building seem to have regarded themselves as tenants from month to month. It was not until July, 1926, that the appellant had any business connection with the premises. On that date it purchased the stock of merchandise belonging to the Hopkins-McLain Company, then in the building. It then merely gave its checks for the monthly rentals in advance.

The appellee seeks to hold the appellant liable as a tenant holding over after the expiration of his term. The doctrine relied on is thus stated in City of San Antonio v. French, 80 Tex. 575, 16 S. W. 440, 26 Am. St. Rep. 763: "In Dorrill v. Stephens, 4 McCord, 59, the Supreme Court of South Carolina say: 'When a tenant holds over after the expiration of the lease with the express or tacit consent of the landlord, the law implies an agreement on part of the landlord that he will let, and on that of the tenant that he will hold on the terms of the expired lease; thus substituting the contract with respect to the term which is past for that which is to come, not merely in form, but in its effect and substance.' In Diller v. Roberts, 13 Serg. & R. 63 [15 Am. Dec. 578], Chief Justice Tilghman says: 'The general rule undoubtedly is that the law implied an agreement that he (the former lessee) should pay the same rent at the same time which he agreed to pay the first year.' In Ellis v. Paige, 1 Pick. 43, the Supreme Court of Massachusetts say: 'If there be a lease for a year, and the tenant continues in possession afterwards, the law implies a tacit renovation of the contract.' In Schuyler v. Smith, 51 N. Y. 309 [10 Am. Rep. 609], it is said: 'The law is too well settled to be disputed that, when a tenant holds over after the expiration of his term, the law will imply an agreement to hold for a year upon terms of the prior lease.' With a view to the determination of the main question in the case, we have deemed it important to ascertain the underlying principle upon which the doctrine we have had under discussion is based. For this purpose we have quoted freely from the authorities, and we think these quotations sufficient to show that the tenant who holds over with the consent of his landlord is deemed to be in possession, upon the terms of his prior lease, upon the ground that the parties are presumed to have tacitly renewed the former agreement."

It is clear from the above quotation that the rule can be applied only where a term for a definite period has expired. There can be no holding over without a previous tenancy, and it is the terms of that tenancy which are implied in the term which follows. In order to bind the appellant as hold-over tenant to a yearly rental contract, it must be shown that it had previously occupied the building under that kind of a contract. Appellee had the burden of proving that fact. The question is: Has he discharged that burden?

As previously stated, there is no evidence that the appellant was a party to the original contract. It conclusively appears from the testimony of E. B. Pate that his statement that he was renting the property to the appellant was only an impression gained from conversations with Henderson. It further appears from his admissions that he would have rented to Adkins for his own personal use if the latter had so desired.

The testimony of Adkins and Henderson as to appellant's lack of interest in the original contract, and the tenancies which immediately followed, is undisputed. There is no evidence that when appellant began to occupy the building in July, 1926, it took any assignment of any prior lease from any party, or had any understanding with the lessor, or his agent, about the terms of the occupancy. Some emphasis is placed upon the contention that the appellant knew the terms of the original contract at the time it took possession of the building, and for that reason should be held to have accepted that kind of a contract.

The notice relied on is the knowledge acquired by Adkins when he had the oral agreement with E. B. Pate in 1922. The rule is well settled that in order to bind a corporation by notice to its agent, the latter must have acquired the notice while acting in his capacity as such agent. There is no evidence of any such notice in this record. It further appears from the undisputed proof that appellant's occupancy of the building began after three other tenants had occupied the building and paid their rentals directly to the landlord. Appellant succeeded the Hopkins-McLain Company, and if bound by any prior contract it is that under which the Hopkins-McLain Company held. There is no evidence as to what kind of a contract the latter had with the lessor, except that which may be implied from the installments of the rentals paid, and these were from month to month.

We think the appellee has failed to produce evidence sufficient to warrant the judgment rendered, and the case will be reversed and remanded for a new trial.